Matthew Langley
California Bar No. 257761
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
(773) 554-9354
matt@almeidalawgroup.com

*[Additional counsel listed on signature page]*

***Attorney for Plaintiffs & the Proposed Class***

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **R.C., K.B., and C.H.,** *individually and on behalf of all others similarly situated,* | CASE NO. 5:24-cv-2003 |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR:** |
| v. | |
| **WALMART INC. d/b/a WALMART**, a Delaware Corporation, | **1. COMMON LAW INVASION OF PRIVACY – INTRUSION UPON SECLUSION** |
| Defendant. | **2. NEGLIGENCE** |
| | **3. UNJUST ENRICHMENT** |
| | **4. VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(1),** *et seq.* |
| | **5. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, Cal. Penal Code §§ 630,** *et. seq.* |
| | **6. VIOLATION OF ILLINOIS EAVESDROPPING STATUTE, 720 Ill. Comp. Stat. 5/14,** *et seq.* |
| | **7. VIOLATION OF WISCONSIN ELECTRONIC SURVEILLANCE** |

1

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

**CONTROL LAW, WIS. STAT. § 968.31**

**DEMAND FOR JURY TRIAL**

2

## CLASS ACTION COMPLAINT

Plaintiffs R.C., K.B., and C.H. ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their counsel of record, bring this class action lawsuit against Walmart Inc. d/b/a Walmart ("Walmart" or "Defendant"). The allegations set forth in this class action complaint are based on Plaintiffs' personal knowledge, due investigation of undersigned counsel and—where indicated—upon information and good faith belief.

## INTRODUCTION

1.      Plaintiffs bring this class action lawsuit to address Walmart's transmission and disclosure of Plaintiffs' and Class Members' ("Users") personally identifiable information ("PII" or "Private Information") to Pinterest, Inc. ("Pinterest"), and other third parties via tracking pixels (the "Pinterest Tag") and other tracking technologies ("Tracking Technologies") installed on Defendant's website, www.walmart.com (the "Website") and the Walmart App (the "App," and together with the Website and the Portal, the "Digital Properties").[1]

2.      This case concerns a very serious breach of Walmart's data privacy and security obligations as it installed these Tracking Technologies on its Digital Properties to collect and to disclose to unauthorized third parties Plaintiffs' and Class Members' Private Information—without consent—solely for its own pecuniary gain.

3.      The Private Information that Walmart disclosed to Pinterest and other third parties include the fact that Plaintiffs and Class Members intended to or did purchase on the Website various sensitive health products, including

---

[1] Plaintiffs also believe that Defendant installed Tracking Technologies on its pharmacy portal (the "Portal"), but, without the benefit of discovery, does not have access to all of the Digital Properties upon which Defendant placed tracking pixels.

CLASS ACTION COMPLAINT

Plan B, HIV tests, STD tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products, and numerous other products used to diagnose and/or treat highly sensitive and private medical conditions (collectively, "Sensitive Health Products").

4.     Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and denial of insurance coverage.[2]

5.     Simply put, if people do not trust that their sensitive Private Information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole—of which retailers of "pharmacy aisle" products, such as the Sensitive Health Products at issue here, are a foundational part.

6.     Reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health*

---

[2]     *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), available at https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited July 31, 2024) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited July 31, 2024).

---

4

*information: A Baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.**"[3]

7.     The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> ***Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.***
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.***
>
> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*,     and *Flo* make

---

[3]     *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), available at https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited July 31, 2024).

clear that practices like that ***may run afoul of the***
***FTC Act if they violate privacy promises or if the***
***company fails to get consumers' affirmative***
***express consent for the disclosure of sensitive***
***health information***.[4]

8.    Walmart encouraged Plaintiffs and Class members to access and to use various digital tools via its Digital Properties, in order to, among other things, receive healthcare services and purchase sensitive health products. However, unbeknownst to the users of its Digital Properties ("Users") and without Users' authorization or informed consent, in order to gain additional insights into its customers, improve its return on its marketing dollars and, ultimately, to increase its revenue, Walmart disclosed Users' Private Information to Pinterest and other third parties.

9.    Plaintiffs and Class Members reasonably expected that their healthcare-related communications with Defendant via its Digital Properties were confidential, solely between themselves and Walmart and that such communications would not be transmitted to or intercepted by a third party. Plaintiffs and Class Members would not have provided their sensitive Private Information to Walmart had they known that Defendant would disclose it to unauthorized third parties.

10.    Plaintiffs' and Class Members' Private Information has value—both to Plaintiffs and Class Members as well as to third parties—and, companies like Pinterest utilize the precise type of information disclosed by Defendant to identify, target, and market products and services to individuals.

11.    Defendant and other companies collecting such Private

---

[4]    *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

CLASS ACTION COMPLAINT

Information also use it for retargeting, a form of online marketing that targets users with advertisements based on their previous Internet communications and interactions.

12.    The conduct alleged in this suit includes Walmart sending to Pinterest—without any consent whatsoever—the name of the Sensitive Health Products that revealed Plaintiff R.C.'s private and sensitive health conditions and treatments of those conditions—simply because Plaintiff placed the product in her shopping cart on Defendant's Website. Walmart did the same thing for Plaintiff K.B., C.H., and millions of other customers who placed Sensitive Health Products in their virtual shopping carts on the Digital Properties.

13.    Walmart has a presence in all fifty states, the District of Columbia, and Puerto Rico, and employs approximately 1.6 million associates in the U.S. In addition, Walmart is one of the world's largest brick-and-mortar retailers, offering an assortment of health services and products through its pharmacy, health & wellness, and personal care departments. With customers increasingly shopping across Digital Properties, Walmart has introduced a series of e-commerce solutions to enhance their online experience. This includes Mobile Scan & Go and the Walmart App, which allows customers to browse, search, and buy merchandise, including Sensitive Health Products.[5]

14.    During the Class Period, Walmart operated "the second largest eCommerce retailer in the United States behind Amazon with eCommerce

---

[5]    *See* Walmart's U.S. About Section, https://corporate.walmart.com/about (last visited July. 31, 2024).

CLASS ACTION COMPLAINT

making up over 18 [percent] of Walmart's sales."[6]  The company's four percent increase in sales can be attributed to its strength in grocery and health & wellness.[7]

15.    As of April 30, 2024, Defendant maintained and operated, and continues to maintain and operate, the Website and the App through which its customers can, among other things, learn about Defendant's services, find Walmart stores, purchase healthcare supplies, schedule a number of different vaccinations and otherwise interact with Defendant.[8]

16.    Walmart acknowledges the need for rapid development of its digital platform. For example, the company states in its 2024 Annual report that:

> Through innovation, we strive to continuously improve a customer-centric experience the seamlessly integrates our eCommerce and retail stores in an omni-channel offering that saves time for our customers. Each week, we serve approximately 255 million customers who visit more than 10,500 stores and numerous eCommerce websites.
>
> **Failure to successfully execute our omni-channel strategy and the cost of our investments in eCommerce and technology may materially affect our market position, net sales and financial performance.**
>
> The retail business continues to rapidly evolve and consumers increasingly embrace digital shopping.

---

[6]    *See* https://www.indigo9digital.com/blog/4-secrets-to-walmarts-ecommerce-sucess (last visited July 31, 2024.)

[7]    *See* https://www.pymnts.com/earnings/2024/walmart-ecommerce-sales-gain-on-pickup-and-delivery-marketplace-sellers-up-20percent/ (last visited July 31, 2024).

[8]    *See* Walmart Home Page, https://www.walmart.com (last visited July 31, 2024).

CLASS ACTION COMPLAINT

As a result, the portion of total consumer expenditures with retailers and wholesale clubs occurring through Digital Properties is increasing and the pace of this increase could continue to accelerate.

Our strategy, which includes investments in eCommerce, technology, including the use of artificial intelligence technology, talent, supply chain automation, acquisitions, joint ventures, store remodels and other customer initiatives may not adequately or effectively allow us to continue to grow our eCommerce business, increase comparable sales, maintain or grow our overall market position or otherwise offset the impact on the growth of our business of a moderated pace of new store and club openings and sustain the current pace of remodels.

**The success of this strategy will depend in large measure on our ability to continue building and delivering a seamless omni-channel shopping and interconnected ecosystem** for our customers that deepens and maintains our relationships with our customers across our various businesses and partnerships and reinforces our overall enterprise strategy.

**If we do not identify or effectively respond to consumer trends or preferences, it could negatively affect our relationship with our customers, demand for the products and services we sell, our market share and the growth of our business.**[9]

17.    What Walmart has not publicly acknowledged is that customers would be unknowingly sacrificing their privacy by using Walmart's Digital

---

[9]    *See* Walmart Inc., *2024 Annual Report,* p. 6, 15 (2024) (https://corporate.walmart.com/content/dam/corporate/documents/newsroom/2024/04/25/walmart-releases-2024-annual-report-and-proxy-statement/walmart-inc-2024-annual-report.pdf) (emphasis added).

Platform. That is, Walmart made the conscious and intentional decision to put its profits over the privacy of its Users, which number several million. Specifically, Walmart installed certain tracking technologies on its Website in order to intercept and to send Private Information to third parties without its Users' consent.

18.    The information collected and disclosed by Defendant's Tracking Technologies is not anonymous and is viewed and categorized by the intercepting party on receipt. For example, in the case of information sent by Walmart to Pinterest, Users' sensitive health information was linked and connected to Users' Pinterest profiles through their unique Pinterest User ID ("Pinterest ID") and other unique personal identifiers so that there was no anonymity. With this Private Information, Pinterest and/or any third parties would be able to associate such personal health data with Plaintiffs and all Class Members.

19.    Through the Pinterest Tag, a tracking tool intentionally incorporated by Walmart in the Website source code or otherwise affirmatively permitted on the Digital Properties by Walmart, for customers who used the Digital Properties to obtain Sensitive Health Products, including Plaintiffs, Defendant disclosed their Private Information to Pinterest, all without its customers' knowledge and/or consent.

20.    When Plaintiffs and other customers used the Digital Properties in order to search for and to obtain healthcare products, unbeknownst to them, *the names of their Sensitive Health Products*, including, Plan B emergency contraception, HIV tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products, *along with their personal information, personal identifiers, and the date and time they accessed the product*, were secretly disclosed to Pinterest,

an unauthorized third party.

21.    Thus, through its actions and practices, Walmart has disclosed Plaintiffs' and Class Members' Private Information to Pinterest. And Pinterest has in turn viewed Plaintiffs' and Class Members' Private Information—as it must view that information to specifically target Plaintiffs and Class Members with advertisements based on their health conditions. This massive breach of confidentiality and privacy has, on information and belief, affected millions of Walmart customers in the State of California as well as millions more nationwide.

22.    As detailed herein, Walmart's privacy policies, both current and over the Class period, provided no warning whatsoever that Class Members' Private Information would be disclosed to Pinterest for marketing purposes or otherwise.

23.    At all times relevant to this action, Plaintiffs and Class Members had no informed consent that information about their sensitive health conditions would be transmitted to a large social media company and advertising giant.

24.    Despite Defendant's representations and material omissions—as well as many other similar ones in its privacy policies and elsewhere—that sensitive user data regarding Plaintiffs' and Class Members' health conditions is shared with consent—on June 30, 2023, Walmart was named in an article by *The Markup* regarding its use of the Pinterest tag to send Pinterest highly sensitive health information that Walmart collected from customers seeking Sensitive Health Products. [10]

25.    Upon information and good faith belief, Walmart had shared the

---

[10]    *See* https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed July 31, 2024).

CLASS ACTION COMPLAINT

sensitive healthcare information of millions of Users with an unauthorized third party, including Pinterest, for years prior to the release of *The Markup*'s article.

26.    Leading up the article's publication, journalists from *The Markup* contacted Walmart about the fact that it was sharing with Pinterest when Users placed HIV tests in their virtual carts. Unlike several other retailers, Walmart did not respond, and it still tells Pinterest anytime a User places an HIV test in their virtual cart to this day—as well as information about the searching for and purchase of numerous other Sensitive Health Products.

27.    Moreover, with respect to all of Defendant's disclosure of Private Information, Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web based technology to ensure its Digital Properties were safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Pinterest or others; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through Tracking Technologies; (v) failing to warn Plaintiffs and Class Members that their Private Information was being shared with third parties without express consent; and (vi) otherwise failing to design, and monitor its Digital Properties to maintain the confidentiality and integrity of Users' Private Information.

28.    Defendant's actions constitute an extreme invasion of Plaintiffs' and Class Members' privacy. Defendant's actions also violated common law, the California Constitution, and numerous federal and state statutes. As a

result, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of the Private Information; (iv) statutory damages and (v) the continued and ongoing risk to their Private Information.

29.    Plaintiff R.C. brings this class action on behalf of herself and all natural persons residing in California who used Defendant's Digital Properties to purchase Sensitive Health Products and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party (hereinafter, "California Subclass Members").

30.    Plaintiff K.B. brings this class action on behalf of herself and all natural persons residing in Wisconsin who used Defendant's Digital Properties to purchase Sensitive Health Products and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party (hereinafter, "Wisconsin Subclass Members").

31.    Plaintiff C.H. brings this class action on behalf of himself and all natural persons residing in Illinois who used Defendant's Digital Properties to purchase Sensitive Health Products and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party (hereinafter, "Illinois Subclass Members").

32.    Plaintiffs also bring this class action on behalf of themselves and all natural persons who used Defendant's Digital Properties to purchase Sensitive Health Products and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party (hereinafter, "Nationwide Class Members" and, collectively with California Subclass Members and Illinois Subclass Members, hereinafter "Class Members").

CLASS ACTION COMPLAINT

**PARTIES**

33.    Plaintiff R.C. is a citizen of California residing in Palm Desert, Riverside County, California, where she intends to remain indefinitely. Plaintiff R.C. used Defendant's Website for the purpose of purchasing Sensitive Health Products including Monistat, a yeast infection treatment, within the past year. Specifically, Plaintiff R.C. placed Monistat in her virtual shopping cart on the Website and then purchased the product in the physical store in California. As a result, her Private Information was disclosed to Pinterest without her knowledge, consent or authorization.

34.    Plaintiff K.B. is a citizen of Wisconsin residing in Ashland, Ashland County, Wisconsin, where she intends to remain indefinitely. Plaintiff K.B. used Defendant's Website to purchase Sensitive Health Products including hemorrhoid creams, feminine products, and KY Jelly, within the past year. As a result, her Private Information was disclosed to Pinterest without her knowledge, consent or authorization.

35.    Plaintiff C.H. is a citizen of Illinois residing in Springfield, Sangamon County, Illinois, where he intends to remain indefinitely. Plaintiff C.H. used Defendant's Website to purchase Sensitive Health Products including condoms, testosterone, and weight loss medications within the past year. As a result, his Private Information was disclosed to Pinterest without his knowledge, consent or authorization.

36.    Defendant Walmart Inc. is a Delaware Corporation, headquartered at 702 SW 8th Street, Bentonville, Arkansas 72716. Defendant Walmart Inc. does business as Walmart throughout the United States.

**JURISDICTION & VENUE**

37.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, including the ECPA, 28

14

U.S.C. § 2511, *et seq.* The Court has supplemental jurisdiction over Plaintiffs' claims arising under state law under 28 U.S.C. § 1367.

38.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA") because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and minimal diversity exists because at least one class member and Defendant are citizens of different states.

39.     The Court has personal jurisdiction over Walmart because it regularly engages in extensive business throughout the country and the State of California, including through its hundreds of stores in California, because Plaintiff R.C. used the Website in California—where her Private Information was disclosed without consent to Pinterest and other third parties, and because Plaintiff R.C. purchased the Monistat product she selected on the Website in the physical Walmart store in California.

40.     Venue is proper in this District pursuant to 28 U.S.C.§ 1391(b)(1) because many of the acts and/or omissions giving rise to the claims asserted herein occurred in this judicial district.

## **FACTUAL BACKGROUND**

**I.     IN ORDER FOR PLAINTIFFS & CLASS MEMBERS TO PURCHASE SENSITIVE HEALTH PRODUCTS ON ITS DIGITAL PROPERTIES, DEFENDANT REQUIRED THEIR PRIVATE INFORMATION TO BE COLLECTED & STORED.**

41.     Throughout the Class Period, Defendant maintained and operated the Digital Properties, including the Website, by and through which Defendant encouraged and permitted consumers to seek healthcare products.

42.     To purchase Sensitive Health Products, Plaintiffs and other Class Members were required to search for and to add the healthcare products

to their virtual cart before proceeding to checkout.

43.    Each step of this process was tracked and logged by the Tracking Technologies, including the Pinterest Tag.

44.    On information and good faith belief, throughout the Class Period, the process for purchasing healthcare products on the Website has been substantially the same in all material respects throughout the United States.

45.    Thus, in order to use the Digital Properties, including the Website to purchase healthcare products, Plaintiffs and other Class Members were required by Defendant to disclose confidential, private, and sensitive personal and health information to Walmart, and to have that information stored on Defendant's website servers along with their personal identifiers.

## II.    DEFENDANT SECRETLY DISCLOSED, & PERMITTED THIRD PARTIES TO INTERCEPT, PLAINTIFFS' & CLASS MEMBERS' PII.

46.    Completely unbeknownst to Plaintiffs and other Class Members, and continuing to the present, the Private Information that they communicated to Defendant through the Digital Properties while purchasing Sensitive Health Products was intercepted by and/or disclosed to unauthorized third parties, including Pinterest.

47.    Pinterest operates one of the world's largest social media platforms and generated roughly $3.055 billion in revenue in 2023 from selling advertising.[11]

48.    Pinterest also tracks people through its widespread internet

---

[11]Pinterest Announces Fourth Quarter and Full Year 2023 Results, https://investor.pinterestinc.com/press-releases/press-releases-details/2024/Pinterest-Announces-Fourth-Quarter-and-Full-Year-2023-Results-Delivers-Record-High-Users-and-Robust-Margin-Expansion/default.aspx

CLASS ACTION COMPLAINT

marketing products and ubiquitous trackers.

49.    Pinterest sells advertising space by highlighting its ability to target consumers.[12] Pinterest can target consumers so effectively because it surveils user activity both on and off Pinterest sites and apps. This allows Pinterest to make inferences about users based on what information they explicitly disclose.

50.    Pinterest compiles this information into a generalized dataset called "Pinterest personas," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.

51.    Pinterest utilizes the precise type of information disclosed by Walmart to identify, target and market products and services to individuals.

52.    Advertisers like Walmart can select "Personas"[13] which "helps you to reach specifically tailored, custom audiences on Pinterest. These audiences are created by the sales team at Pinterest on behalf of advertisers, and made up of lists of people who are not easily targeted by interest targeting and keyword targeting."[14]

53.    Advertisers can target existing customers directly through Pinterest Visitor Audiences, and they can also build Personas similar to their existing customers.

54.    As Pinterest puts it, "You can look at data across the entire customer lifecycle so you know exactly where you're winning customers, or missing out. We recommend implementing both the Pinterest tag and the Conversions API so you get a more complete view of what's working, and

---

[12] Pinterest Business Advertise, https://business.pinterest.com/advertise/

[13] Pinterest Custom Targeting

https://help.pinterest.com/en/business/article/audience-targeting

[14] *Id.*

why."[15]

55.    The Pinterest Tag ("Pinterest Tag") is a bit of code that advertisers can integrate into their websites, mobile applications and servers, thereby enabling Pinterest to intercept and collect user activity on those platforms. Pinterest says, "The Pinterest tag is a piece of code that you add to your website. It lets Pinterest track visitors to your site, as well as the actions they take on your site after seeing your Pinterest ad."[16]

56.    Pinterest explains that the Pinterest Tag can also track and log specific consumer actions, such as clicking a button. These actions are called "conversions".[17]

57.    According to Pinterest, "When someone takes an action on your website, such as signing up for a newsletter or buying a product, **it's known as a conversion**. **There are nine different conversions you can track**:

- Pagevisit: Views of primary pages, such as product pages and article pages
- Viewcategory: Views of category pages
- Search: Searches on your website
- Addtocart: Items being added to shopping carts
- Checkout: Completed transactions
- Watchvideo: Video views
- Signup: Sign-ups for your products or services
- Lead: Interest in your products or services

---

[15] PINTEREST ANALYTICS AND MEASUREMENT, https://business.pinterest.com/analytics-and-measurement/

[16] INSTALLING THE PINTEREST TAG, https://help.pinterest.com/en/business/article/install-the-pinterest-tag

[17] *Id.*

CLASS ACTION COMPLAINT

- Custom: Special event unique to your site"[18]

(emphasis added)

58. The Pinterest Tag is customizable by those who install the tracking technology on its website. Meaning advertiser, like Defendant, can choose the conversions Pinterest Tag will track and measure.

59. Pinterest Tag is configured to capture certain data, like when a User visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[19] Pinterest Tag can also track other conversions and offers a menu from which advertisers can choose, including what content a visitor views or purchases.[20] Advertisers can even create their own tracking parameters by building "custom conversions." [21]

60. Pinterest offers this code to advertisers, like Walmart, to integrate into their website and other digital properties.

61. Pinterest tells advertisers that Pinterest Tag will improve their Pinterest advertising through the following features:

  i. "See the total impact of your paid and organic content working together to increase page visits, add-to-carts and checkouts
  ii. Understand your audience's decision-making journey from Pinterest to conversion on your site
  iii. Gain new insights about whether measuring conversions based on views leads to checkouts like clicks do

---

[18] TRACK CONVERSIONS WITH THE PINTEREST TAG, https://help.pinterest.com/en/business/article/track-conversions-with-pinterest-tag

[19] *Id.*

[20] *Id.*

[21] *Id.*

iv.  Identify top converting Pins and turn your best performing organic Pins into ads to amplify conversions"[22]

62.    Pinterest advises web developers to place Pinterest tracking code early in the source code for any given webpage or website to ensure that visitors will be tracked before they leave the webpage or website: "Paste the code between the <head> and </head> tags in your HTML document."[23]

63.    Pinterest also provides advertisers with step-by-step instructions for setting up and installing Pinterest Tag tracking technology on their website.[24]

64.    If a retailer, such as Walmart, installs the Pinterest Tag as Pinterest recommends, Users' actions on the retailer's website are contemporaneously redirected to Pinterest. When a User clicks a button to purchase or add to their cart a Sensitive Health Product, Pinterest's source code commands the User's computing device to send the content of the User's communication to Pinterest while the User is communicating with the retailer—traveling directly from the User's browser to Pinterest's server.

65.    By design, Pinterest receives the content of a User's communication (that he or she intends to or did purchase a Sensitive Health Product) immediately when the User clicks a button to carry out that action—even before the retailer.

**A. Defendant's Pinterest Tag, Source Code & Interception of HTTP Requests and Personally Identifiable Information**

66.    Web browsers are software applications that allow consumers to

---

[22]    PINTEREST    CONVERSION    INSIGHTS    ANALYTICS, https://analytics.pinterest.com/conversion-insights/

[23]    PINTEREST BUSINESS HELP CENTER: ADD THE BASE CODE TO YOUR WEBSITE, https://help.pinterest.com/en/business/article/install-the-base-code

[24]    *Id.*

navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome, Mozilla's Firefox, Apple's Safari, and Microsoft's Edge).

67.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via web browsers.

68.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from client devices to the host server.  Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of

CLASS ACTION COMPLAINT

file, text information, or error codes, among other data.[25]

69.     A customer's HTTP Request essentially asks the Website to retrieve certain information (such as Sensitive Health Products placed in the virtual shopping cart), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the customer's screen as they navigate the Website).

70.     Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

71.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Pixel and other tracking technologies Walmart uses constitute source code that does just that. These tracking technologies thus act much like a traditional wiretap.

72.     Walmart encourages customers to use its Digital Properties to purchase healthcare products and take other actions related to their personal health care. When interacting with Walmart's Digital Properties like this, Plaintiffs and Class Members convey highly private and sensitive information to Walmart.

73.     When Users visit Walmart's Digital Properties via an HTTP Request to Walmart's server, that server sends an HTTP Response including the Markup that displays the webpage visible to the user and Source Code,

---

[25]     One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

CLASS ACTION COMPLAINT

including Walmart's Pixel.

74.    Thus, Walmart is in essence handing customers a tapped device, and once the webpage is loaded into the customer's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Walmart and transmits those communications to third parties, including Pinterest, Google, and others.

75.    Pinterest places third-party cookies in the web browsers of Users logged into their services as well as those who are not logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party, such as Pinterest, can uniquely identify the customer associated with the Private Information intercepted.

76.    Specifically, Pinterest deposits cookies named _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua, onto Plaintiffs' and Class Members' computing devices. The _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies are Pinterest identifiers that are set by Pinterest source code and associated with Defendant's use of the Pinterest Tag program. These are cookies associated with the third-party Pinterest and are unique to each User.

77.    Defendant intentionally configured Pinterest Tags installed on its Website to capture both the "characteristics" of individual Users' communications with the Defendant's Website (e.g., their IP addresses, Pinterest User ID, cookie identifiers, device identifiers and account numbers) and the "content" of these communications (i.e., the buttons, links, pages, and tabs they click and view, as well as search terms entered into free text boxes and descriptive URLs showing the information being exchanged).

CLASS ACTION COMPLAINT

78.    Furthermore, if the Website visitor is also a Pinterest user, the information Pinterest receives is linked to the visitor's Pinterest profile (via their Pinterest User ID), which includes other identifying information that specifically identifies the User, including Plaintiffs and Class Members.

79.    According to Pinterest, the _pinterest_ct_rt cookie "contain[s] a user ID and the timestamp at which the cookie was created."[26]

80.    Similarly, the "_pinterest_sess is the Pinterest login cookie. It contains user ID(s), authentication token(s) and timestamps. If the person is logged out, authentication tokens are deleted but [Pinterest] leave[s] the cookie present. [Pinterest] use[s] the logged out user ID(s) to optimize the person's experience and measurement."[27]

81.    Expert analysis has confirmed that Pinterest can even identify a User based on the _pinterest_sess cookie regardless of whether they logged out of Pinterest before visiting a Pinterest Tag-enabled site like Defendant's.

82.    That is, even after a Pinterest User logs out of Pinterest, when he or she visits a website with the Pinterest Tag enabled, Pinterest will receive and associate that User's actions with their Pinterest ID. In other words, even if a User suspected Pinterest was tracking their activities on other websites (say, based on targeted ads the User notices in their feed), and the User wishes to avoid targeted ads based on their interest in Sensitive Health Products and logs out of Pinterest for that reason—Pinterest still tracks their "conversions" and exploits that sensitive information for monetary gain in the form of targeted ads.

83.    When an individual visits a Pinterest Tag-enabled website, such as walmart.com, the Pinterest Tag will set the _pinterest_ct_ua cookie and

---

[26] https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies
[27] *Id.*

that cookie will stay on the User's browser for a year. (A similar _pinterest_unauth cookie may also be placed, but as a first-party cookie.) As the User browses the internet, that same cookie will show up anywhere the Pinterest Tag is installed. Even if the user never logs into Pinterest, Pinterest will keep a "shadow profile" to store all the data collected about that User. As soon as that user logs into Pinterest, Pinterest will then associate all that data with the authenticated User.

84.    Thus, without any knowledge, authorization, or action by a User, a website owner like Walmart can and does use its source code to commandeer a User's computing device, causing the device to contemporaneously and invisibly re-direct the Users' communications to third parties such as Pinterest.

85.    In this case, Walmart employed just such devices (the Pinterest Tag and similar technologies) to intercept, duplicate, disclose, and re-direct Plaintiffs' and Class Members' Private Information to third parties like Pinterest, Google, and others.

86.    By doing so, Walmart allowed Pinterest to (i) secretly intercept Users' communications about their purchases of Sensitive Health Products and numerous other products to diagnose and/or treat highly sensitive and private conditions on the Digital Properties and (ii) identify those Users based on their Pinterest ID so that Pinterest and any advertiser using Pinterest ads could send them targeted ads based on their private health conditions— *conditions that they never consensually disclosed to Pinterest.*

**B.    *Walmart Improperly Disclosed Plaintiffs' & Class Members' Private Information to Pinterest.***

87.    Walmart utilized Pinterest advertisements and intentionally installed the Pinterest Tag on its Digital Properties—and the Pinterest Tag

continues to operate there today.

88.     At Walmart's request and through its custom installation, the Pinterest Tag transmits Private Information shared by Plaintiffs and Class Members, without their consent, to Pinterest in accordance with the Pinterest Tag's configuration.

89.     When the Pinterest Tag is embedded in the Website's source code, Pinterest instructs a User's browser to transmit a contemporaneous and secret transmission to Pinterest which contains the original GET request sent to the host website, along with additional data that Pinterest Tag is configured to collect, including the Pinterest ID that specifically identifies the User. The events contain the page_urls and other data, for example product ids, prices, quanity, etc. The data also includes the user's action such as PageView, Search, or AddToCart. This transmission is initiated by the Pinterest code installed by Walmart and concurrent with the Users' communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Walmart's Website—Walmart's own code, and the Pinterest code Walmart embedded.

90.     Walmart, through its installation and use of the Pinterest Tag, disclosed to Pinterest the content of User communications while its Users were exchanging communications with Walmart's Digital Properties, which Pinterest used to target Users with ads.

91.     When Plaintiffs or another Class Member visited the Website and completed the steps necessary to purchase Sensitive Health Products to treat highly sensitive and private conditions, the Pinterest Tag automatically caused Plaintiffs' or Class Member's personal identifiers, including IP addresses and the _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies, to be transmitted to Pinterest, attached to the fact that Plaintiffs or

Class Members had visited the webpages of Sensitive Health Products and placed those products in their carts or purchased them.

92.     Rather than merely transmit the "automatic events" that the Pinterest Tag automatically collects and transmits from a website without the website owner or developer being required to add any additional code, on information and belief, Defendant intentionally configured the Pinterest Tag on its Website to track, collect, and disclose "custom events" such as the name of the Sensitive Health Products to treat highly sensitive and private conditions that a customer was seeking to purchase, and the fact that the customer was purchasing or seeking to purchase these Sensitive Health Products.

93.     Thus, put simply, when Plaintiffs or other Class Members used Defendant's Website to purchase Sensitive Health Products their identities, personal identifiers, and health information (including their medical conditions, sexual activity, diagnostics, and treatments sought) was disclosed to Pinterest.

94.     Defendant disclosed Plaintiffs' and Class Members' Private Information to Pinterest in order to improve its marketing and advertising, in order to increase Defendant's revenues and profits.

**C.    *Demonstrative Evidence that Walmart Improperly Disclosed Plaintiffs' & Class Members' Private Information to Pinterest.***

95.     Defendant installed a Pinterest Tag with ID 2613085986650 ("PT1") from at least June 29, 2021 to present.

96.     Through PT1, Defendant disclosed Users' Private Information to Pinterest as they navigated the Digital Properties, including the Website, disclosing Users' browsing activities as they (i) searched for Sensitive Health Products, (ii) viewed Sensitive Health Products, (iii) added Sensitive Health

CLASS ACTION COMPLAINT

Products to their virtual cart, and (iv) purchased Sensitive Health Products.

97.    When a User on the Website clicks the "Add to Cart" button on the webpage containing a Sensitive Health Product, indicating that the User is searching for and attempting to purchase that product, Defendant sends a custom Pinterest conversion revealing that the User clicked to add that item to his or her cart. In the same transmission, Defendant sends the User's unique _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies to Pinterest, which Pinterest then uses to identify the User as a particular person.

98.    For example, when a User navigates to the webpage of "Plan B One-Step Emergency Contraceptive (72 Hour Efficacy Window)" and clicks "Add to Cart," Defendant's custom installation of the Pinterest Tag instantaneously informs Pinterest that this User has done so. The figures below show the Pinterest Tag's "Add to Cart" conversion doing exactly this, which is precisely as Walmart intended:



CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT



99.    As demonstrated by the highlights in the figures above, Walmart discloses to Pinterest, through the Pinterest Tag, the name of the Sensitive Health Product ("Plan B One Step Emergency Contraceptive 72 Hour Efficacy Window"), that the User has placed this product into their virtual online cart, the product id used to identify the product, the price of the product, and the quantity of the product that was placed into the User's cart.

100.    The figures below show the Pinterest Tag sending that User's _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies to Pinterest, together with the information concerning the Sensitive Health Product, that allows Pinterest to identify the identity of the specific User that placed the Sensitive Health Product, in this case Plan B emergency contraception, into their cart, which is also exactly what Walmart intended:



101.  In another example, when a User navigates to the webpage of "OraQuick In-Home HIV Test, 1 Single Use Test" and clicks "Add to Cart," Defendant's custom installation of the Pinterest Tag instantaneously informs Pinterest that this User has done so, revealing the name of the Sensitive Health Product (the HIV Test), that the product was placed into the User's cart, the quantity and the cost of the . The figures below show the Pinterest Tag's "Add to Cart" conversion doing this, as Walmart intended:



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

102.   The figure below shows the Pinterest Tag sending that User's _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies to Pinterest, so Pinterest can identify the User that placed the HIV Test in their cart:

CLASS ACTION COMPLAINT

103.   In another example, when a User navigates to the webpage of "Everlywell Chlamydia and Gonorrhea Test," Defendant's custom installation of the Pinterest Tag instantaneously informs Pinterest that this User has done so. The figures below show the Pinterest Tag's "Add to Cart" conversion doing this, as Walmart intended:

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

104.   The figure below shows the Pinterest Tag sending that User's _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies to Pinterest, so Pinterest can identify the specific User that placed the Sensitive Health Product in their cart:



CLASS ACTION COMPLAINT

105.   In another example, when a User navigates to the webpage of "Monistat 1 Day Yeast Infection Treatment, Miconazole Ovule Insert & External Anti-Itch Cream" and clicks "Add to Cart," Defendant's custom installation of the Pinterest Tag instantaneously informs Pinterest that this User has done so. The figures below show the Pinterest Tag's "Add to Cart" conversion doing this, as Walmart intended.



CLASS ACTION COMPLAINT

106.   The figures below show the Pinterest Tag sending that User's _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies to Pinterest, so Pinterest can identify *that* person placed *that* product in his or her cart, which is also exactly what Walmart intended.



107.   In each of the examples above, the User's website activity and the contents of their communications are sent to Pinterest alongside their PII. Several different methods allow marketers and third parties to identify individual Users, but the examples above demonstrate what happens when the website User is logged into Pinterest on their web browser or device. When this happens, the Users' identity is revealed via third-party cookies that work in conjunction with the Pinterest Tag.

108.   For example, the Pixel transmits the User's _pinterest_sess, _pinterest_ct_rt, and _pinterest_ct_ua cookies, which contains that User's

CLASS ACTION COMPLAINT

1 unencrypted Pinterest ID, and allows Pinterest to link the User's online

2 communications and interactions to their individual Pinterest profile.

3     109.  Pinterest receives at least eight cookies when Defendant's

4 website transmits information via the Pixels:

5

| ✕ | Headers | Payload | Preview | Response | Initiator | Timing | Cookies |
|---|---------|---------|---------|----------|-----------|--------|---------|

**Request Cookies**    ☐ show filtered out request cookies

| Name ▲ | Value | Domain | Path | Ex... | Size | Htt... | Sec... | Sa... | Par... | Cr... |
|--------|-------|--------|------|-------|------|--------|--------|-------|--------|-------|
| __Secure-s_a | c1c5Tl... | .pinterest.com | / | 20... | 1392 | ✓ | ✓ | No... | | |
| _pinterest_ct_rt | TWc9... | .ct.pinterest.com | / | 20... | 744 | | ✓ | No... | | |
| _pinterest_ct_ua | "TWc9... | .ct.pinterest.com | / | 20... | 210 | | ✓ | No... | | |
| _pinterest_sess | TWc9... | .pinterest.com | / | 20... | 1855 | ✓ | ✓ | No... | | |
| ar_debug | 1 | .pinterest.com | / | 20... | 9 | ✓ | ✓ | No... | | |

**Response Cookies**

| Name ▲ | Value | Domain | Path | Ex... | Size | Htt... | Sec... | Sa... | Par... | Cr... |
|--------|-------|--------|------|-------|------|--------|--------|-------|--------|-------|
| _pinterest_ct_rt | TWc9... | ct.pinterest.com | / | 20... | 841 | | ✓ | No... | | |
| _pinterest_ct_ua | "TWc9... | ct.pinterest.com | / | 20... | 306 | | ✓ | No... | | |
| ar_debug | 1 | .pinterest.com | / | 20... | 114 | ✓ | ✓ | No... | | |

    110.  Defendant did not seek and did not have Plaintiff's and Class

Members' consent to share any of the sensitive Private Information described

above.

**IV.   WALMART DOES NOT DISCLOSE TO PLAINTIFFS OR CLASS MEMBERS THAT IT SENDS PRIVATE INFORMATION ABOUT SENSITIVE HEALTH PRODUCTS TO THIRD PARTIES FOR MARKETING PURPOSES.**

    111.  Walmart's privacy policies, including its current policies and

historical policies during the Class Period, did not present themselves in a

conspicuous manner to put Plaintiffs or Class Members on notice that it

would allow third parties like Pinterest to intercept their Private Information

regarding the purchase of Sensitive Health Products on the Website or to then

use that information to target them with advertisements about their health

conditions.

CLASS ACTION COMPLAINT

112.   Plaintiffs and Class Members have not provided Walmart with written permission to share their Private Information concerning Sensitive Health Products for marketing purposes.

113.   Moreover, Defendant's privacy policies, despite their increasing breadth over the years with respect to sharing customers' data, have never specifically disclosed to Plaintiffs or Class Members that their viewing or purchase of Sensitive Health Products will be sent to social media companies for any purposes, have never disclosed that the information they send will be personally identifiable, nor has Defendant every obtained informed consent from Plaintiffs or Class Members to do so.[28]

114.   Despite a lack of disclosure, Walmart allowed third parties such as Pinterest to "listen in" on Users' confidential communications with Walmart and to intercept and use the contents of those communications for advertising purposes in order to bolster its profits.

115.   As alleged herein, after Pinterest viewed and analyzed Plaintiffs' private communications with Walmart, Plaintiffs began receiving targeted ads on their Pinterest accounts related to the medical conditions and treatments they disclosed to Defendant.

116.   Under Federal Law, a healthcare provider, like Defendant, may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[29]

## VI.   USERS' REASONABLE EXPECTATION OF PRIVACY.

117.   Plaintiffs and Class Members were aware of Walmart's duty of

---

[28] *See* https://corporate.walmart.com/privacy-security/walmart-privacy-notice

[29]     HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

CLASS ACTION COMPLAINT

confidentiality when they searched for and purchased Sensitive Health Products from Walmart.

118.    Indeed, at all times when Plaintiffs and Class Members provided their PII to Walmart, they each had a reasonable expectation that their Private Information would remain confidential and that Walmart would not share the Private Information with third parties for a commercial purpose.

119.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

120.    For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[30]

121.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

## VII.    DEFENDANT WAS ENRICHED & BENEFITTED FROM THE USE OF THE PIXEL & UNAUTHORIZED DISCLOSURES.

122.    The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiffs' and Class Members' Private Information was to commit criminal and tortious acts in violation of federal

---

[30]    *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Aug. 8, 2024).

CLASS ACTION COMPLAINT

and state laws as alleged herein, including but not limited to violations of HIPAA and invasion of privacy, among others.

123.    In    exchange    for    disclosing    the    personally    identifiable information of its Users, Defendant is compensated by Pinterest in the form of enhanced advertising services and more cost-efficient marketing on Pinterest.

124.    Walmart used the Pinterest Tag on its Digital Properties for its own purposes of intercepting and disclosing its Users Private Information to third parties including Pinterest and Google.

125.    Based    on    information    and    belief,    Walmart    receives compensation from third parties like Pinterest and Google in the form of enhanced advertising services and more cost-efficient marketing on third-party platforms in exchange for disclosing Users' personally identifiable information.

126.    Based on information and belief, Walmart was advertising its services on Pinterest, for one, and the Pinterest Tag was used to "help[] you to reach specifically tailored, custom audiences on Pinterest. These audiences are created by the sales team at Pinterest on behalf of advertisers, and made up of lists of people who are not easily targeted by interest targeting and keyword targeting."[31]

127.    Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

128.    Upon information and belief, Walmart re-targeted customers and potential customers to get more people to use its services. These customers include Plaintiffs and Class Members.

---

[31] *Id.*

129.  By utilizing the Pinterest Tag, the cost of advertising and retargeting was reduced, thereby benefitting and enriching Walmart.

## VIII.  PLAINTIFFS' & CLASS MEMBERS' DATA HAD FINANCIAL VALUE.

130.  Moreover, Plaintiffs' and Class Members' Private Information had value and Defendant's disclosure and interception harmed Plaintiffs and the Class.

131.  Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

132.  The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[32]

133.  Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[33]

134.  Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

---

[32]    *See* https://time.com/4588104/medical-data-industry/ (last visited Aug. 8, 2024).

[33]    *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Aug. 8, 2024).

CLASS ACTION COMPLAINT

135.   Facebook has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

136.   Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions. The monetary value to Plaintiffs and Class Members of their sensitive medical information that Walmart shared with Pinterest and others without consent—such as Plaintiffs' and Class Members' intent to purchase certain medical products and inferences that Plaintiffs and Class Members had particular health conditions that were treated by those medical products—was forever diminished by Walmart's disclosure of that information to Pinterest and others.

137.   Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the medical sector.[34]

138.   Private Information is also a valuable commodity to identify thieves. As the FTC recognizes, identity thieves can use Private Information to commit an array of crimes that include identity theft and medical and financial fraud.[35] A robust "cyber black market" exists where criminals

---

[34]    *Id.*

[35]    FTC, *Warning Signs of Identity Theft, available at*: https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Aug. 8, 2024).

CLASS ACTION COMPLAINT

openly post stolen PII and health information on multiple underground Internet websites, commonly referred to as the dark web.

139.  While credit card information can sell for as little as $1–$2 on the black market, individually identifiable health information can sell for as much as $363.36.

140.  Individually identifiable health information is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.

141.  Individually identifiable health information can also be used to create fraudulent insurance claims and facilitate the purchase and resale of medical equipment, and it can help criminals gain access to prescriptions for illegal use or sale.

142.  Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is comingled with other records, it can lead to misdiagnoses or mistreatment.

143.  The FBI Cyber Division issued a Private Industry Notification on April 8, 2014, that advised the following:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

---

[36]    Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Aug. 8, 2024).

CLASS ACTION COMPLAINT

144.   Cybercriminals often trade stolen Private Information on the black market for years following a breach or disclosure. Stolen Private Information can be posted on the Internet, making it publicly available.

145.   Walmart gave away Plaintiffs' and Class Members' communications and transactions on its Digital Properties without permission.

146.   The unauthorized access to Plaintiffs' and Class Members' Private Information has diminished the value of that information, resulting in harm to Users, including Plaintiffs and Class Members.

## IX.   DEFENDANT USED AND DISCLOSED PLAINTIFFS' & CLASS MEMBERS' PRIVATE INFORMATION WITHOUT PLAINTIFFS' OR CLASS MEMBERS' KNOWLEDGE, CONSENT, AUTHORIZATION OR FURTHER ACTION.

147.   The Tracking Technologies incorporated into, embedded in, or otherwise permitted on Defendant's Website were invisible to Plaintiffs and Class Members while using that Website. The Pinterest Tag and other Tracking Technologies on Defendant's Website were seamlessly integrated into the Website such that there was no reason for Plaintiffs or any Class Member to be aware of or to discover their presence.

148.   Plaintiffs and Class Members were shown no disclaimer or warning that their Private Information would be disclosed to any unauthorized third party without their express consent.

149.   Plaintiffs and Class Members had no idea that their Private Information was being collected and transmitted to an unauthorized third party.

150.   Because Plaintiffs and Class Members had no idea of the presence of Tracking Technologies on Defendant's website, or that their Private Information would be collected and transmitted to Pinterest or other

third parties, they could not and did not consent to Walmart's conduct.

151.    Plaintiffs  and  Class  Members  did  not  give  consent  or authorization for Defendant to disclose their Private Information to Pinterest or to any third party for marketing purposes.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

### *Plaintiff R.C.*

152.    Within the last two years, and numerous other times, Plaintiff R.C.  visited  the  Website,  while  in  California,  and  sought  to  purchase Sensitive Health Products.

153.    On at least one occasion, within the last two years, Plaintiff R.C. specifically  sought  to  purchase  Monistat  in  order  to  treat  a  vaginal  yeast infection and placed Monistat in her virtual shopping cart on the Website.

154.    By  interacting  with  Defendant's  Digital  Properties,  Plaintiff R.C.'s  Private  Information  was  disclosed  to  Pinterest  through  Walmart's placement of the Pinterest Tag on the webpages she visited on Defendant's Digital Properties, including, but not limited to, the webpages for the search engine  and  the  specific  Monistat  product  that  she  placed  in  her  virtual shopping cart on the Website, as well as the virtual shopping cart page. That information  included,  but  was  not  limited  to,  her  search  for  and  intent  to purchase Monistat when she visited the webpage for the product and placed Monistat  into  her  virtual  shopping  cart  on  the  Website  and  the  specific sensitive health condition for which she was  seeking treatment; namely a yeast infection.

155.    Demonstrative screenshots of the Pinterest Tag's placement and function  on  the  Website  with  respect  to  Monistat  products,  including  the Monistat  product  that  Plaintiff  placed  into  her  cart,  are  displayed  in paragraphs 105 through 106 of this Complaint.

156.   Plaintiff R.C.'s Private Information that was disclosed to Pinterest had monetary value to Plaintiff R.C., and Walmart gave it away to Pinterest without Plaintiff R.C.'s consent.

157.   Plaintiff R.C. had an active Pinterest account at the time of her interaction with Defendant's Website when she placed Monistat in her cart.

158.   Plaintiff R.C. was logged into her Pinterest account on the same web browser and same device at the time of her interaction with Defendant's Website when she placed Monistat in her cart.

159.   When Plaintiff R.C. placed Monistat into her cart on the Website, the _pinterest_sess and _pinterest_ct_rt cookies, which contain her unique Pinterest User ID, were sent to Pinterest alongside her intent to purchase Monistat and additional Private Information.

160.   Plaintiff R.C.'s Pinterest cookies were sent to Pinterest with the information about her intent to purchase Monistat because Walmart installed the Pinterest Tag onto the Website with the specific intention of Pinterest learning about Plaintiff R.C.'s health conditions so that Walmart, Pinterest, and any other third parties who use Pinterest ads could target Plaintiff R.C. with ads about her health conditions.

161.   After placing the Monistat product in her cart on the Website, Plaintiff R.C. travelled to the physical Walmart store nearby and purchased that product in-person.

162.   Plaintiff R.C. would not have used the Website to search for or purchase Sensitive Health Products including Monistat had she known that her Private Information would be disclosed to unauthorized third parties.

163.   Plaintiff R.C. believed that because she was on the website of a retailer of Sensitive Health Products, her Private Information concerning her intent to purchase Sensitive Health Products would be protected and kept

confidential.

164.   Plaintiff R.C. also believed that because she was on the website of a healthcare provider and pharmacy, her Private Information would be protected and kept confidential.

165.   Plaintiff R.C. saw nothing on the Website that suggested to her that her Private Information would be disclosed or released to an unauthorized third party.

166.   Plaintiff R.C. did not authorize, consent to, or otherwise engage or permit the release of her Private Information to Pinterest or any third party.

167.   Plaintiff R.C. suffered damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information.

168.   Plaintiff R.C. intends to use the Website in the future so that she can purchase other Sensitive Health Products, but she is concerned about doing so due to Defendant's use of the Pinterest Tag and other Tracking Technologies on the Website and Defendant's use of those tools to tell third parties about her intent to purchase Sensitive Health Products.

169.   Plaintiff R.C. first discovered that Defendant had collected and shared her Private Information without her consent in or around July 2024 after discussing potential claims against Defendant with undersigned counsel.

### *Plaintiff K.B.*

170.   Within the last year, and numerous other times, Plaintiff K.B. visited the Website, while in Wisconsin, and purchased Sensitive Health Products.

171.   On at least one occasion, within the last year, Plaintiff K.B.

CLASS ACTION COMPLAINT

specifically purchased hemorrhoid creams, KY Jelly, and feminine products on the Website while in Wisconsin.

172.   By interacting with Defendant's Digital Properties, Plaintiff K.B.'s Private Information was disclosed to Pinterest through Walmart's placement of the Pinterest Tag on the webpages she visited on Defendant's Digital Properties, including, but not limited to, the webpages for the search engine and the specific hemorrhoid creams, KY Jelly, and feminine products that she placed in her virtual shopping cart on the Website, as well as the virtual shopping cart page. That information included, but was not limited to, her intent to purchase hemorrhoid creams, KY Jelly, and feminine products, and when she placed the hemorrhoid creams, KY Jelly, and feminine products into her virtual shopping cart on the Website and the inference that she had a need for hemorrhoid creams, KY Jelly, and various feminine products.

173.   Plaintiff K.B.'s Private Information that was disclosed to Pinterest had monetary value to Plaintiff K.B., and Walmart gave it away to Pinterest without Plaintiff K.B.'s consent.

174.   Plaintiff K.B. had an active Pinterest account at the time of her interaction with Defendant's Website, and shortly after visiting Walmart's Website to purchase hemorrhoid creams, KY Jelly, and feminine products, she started to receive unsolicited advertisements on Pinterest relating to her purchase of the hemorrhoid creams, KY Jelly, and feminine products, including ads for sexual health products and feminine products.

175.   Plaintiff K.B. would not have used the Website to purchase Sensitive Health Products including hemorrhoid creams, KY Jelly, and feminine products had she known that her Private Information would be disclosed to unauthorized third parties.

176.   Plaintiff K.B. believed that because she was on the website of a

54

healthcare provider and pharmacy, her Private Information would be protected and kept confidential.

177.    Plaintiff K.B. saw nothing on the Website that suggested to her that her Private Information would be disclosed or released to an unauthorized third party.

178.    Plaintiff K.B. did not authorize, consent to, or otherwise engage or permit the release of her Private Information to Pinterest or any third party.

179.    Plaintiff K.B. suffered damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information. Plaintiff K.B. has suffered serious mental anguish and personal embarrassment knowing that information relating to her highly sensitive and private medical conditions and sexual activity have been sent to Pinterest so that she can be targeted based on these conditions and activity.

180.    Plaintiff K.B. intends to use the Website in the future so that she can purchase other Sensitive Health Products, but she is concerned about doing so due to Defendant's use of the Pinterest Tag and other Tracking Technologies on the Website and Defendant's use of those tools to tell third parties about her intent to purchase

181.    Plaintiff K.B. first discovered that Defendant had collected and shared her Private Information without her consent in or around August 2024 after discussing potential claims against Defendant with undersigned counsel.

***Plaintiff C.H.***

182.    Within the last year, and numerous other times, Plaintiff C.H. visited the Website, while in Illinois, and purchased Sensitive Health

Products.

183.   On at least one occasion, within the last year, Plaintiff C.H. specifically purchased condoms, testosterone, and weight loss medications on the Website while in Illinois.

184.   By interacting with Defendant's Digital Properties, Plaintiff C.H.'s Private Information was disclosed to Pinterest through Walmart's placement of the Pinterest Tag on the webpages he visited on Defendant's Digital Properties, including, but not limited to, the webpages for the search engine and the specific condoms, testosterone, and weight loss medications that he placed in his virtual shopping cart on the Website, as well as the virtual shopping cart page. That information included, but was not limited to, his intent to purchase condoms, testosterone, and weight loss medications when he placed the condoms, testosterone, and weight loss medications into his virtual shopping cart on the Website and the inference that he had a need for condoms, testosterone, and weight loss medications.

185.   Plaintiff C.H.'s Private Information that was disclosed to Pinterest had monetary value to Plaintiff C.H., and Walmart gave it away to Pinterest without Plaintiff C.H.'s consent.

186.   Plaintiff C.H. had an active Pinterest account at the time of his interaction with Defendant's Website, and shortly after visiting Walmart's Website to purchase condoms, testosterone, and weight loss medications, he started to receive unsolicited advertisements on Pinterest relating to his purchase of the condoms, testosterone, and weight loss medications, including ads for Trojan condoms, ads for other birth control methods, and ads weight loss medications.

187.   Plaintiff C.H. would not have used the Website to purchase Sensitive Health Products including condoms, testosterone, and weight loss

CLASS ACTION COMPLAINT

medications had he known that his Private Information would be disclosed to unauthorized third parties.

188.   Plaintiff C.H. believed that because he was on the website of a healthcare provider and pharmacy, his Private Information would be protected and kept confidential.

189.   Plaintiff C.H. saw nothing on the Website that suggested to him that his Private Information would be disclosed or released to an unauthorized third party.

190.   Plaintiff C.H. did not authorize, consent to, or otherwise engage or permit the release of his Private Information to Pinterest or any third party.

191.   Plaintiff C.H. suffered damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of his Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to his Private Information.

192.   Plaintiff C.H. intends to use the Website in the future so that he can purchase other Sensitive Health Products, but he is concerned about doing so due to Defendant's use of the Pinterest Tag and other Tracking Technologies on the Website and Defendant's use of those tools to tell third parties about his intent to purchase Sensitive Health Products.

193.   Plaintiff C.H. first discovered that Defendant had collected and shared his Private Information without his consent in or around August 2024 after discussing potential claims against Defendant with undersigned counsel.

## TOLLING, CONCEALMENT & ESTOPPEL

194.   Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Pinterest Tag into its Website.

195.   The Pinterest Tag and other Tracking Technologies on Defendant's Website were and are entirely invisible to a Website visitor.

196.   Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

197.   Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

198.   Defendant had exclusive knowledge that its Website incorporated the Pinterest Tag and other Tracking Technologies and yet failed to disclose to customers, including Plaintiffs and Class Members, that by purchasing Sensitive Health Products including Plan B, HIV tests, STD tests, pregnancy tests, prenatal vitamins, hyperglycemic/hypoglycemic management products and numerous other products to diagnose and/or treat highly sensitive and private conditions through Defendant's Website, Plaintiffs' and Class Members' Private Information would be disclosed or released to Pinterest and other unauthorized third parties.

199.   Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Private Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Private Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

200.   Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

201.   As alleged above, the earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's

CLASS ACTION COMPLAINT

conduct would have been shortly before the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

202.   Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seeks to represent the Classes, defined as follows:

### The Nationwide Class

"All natural persons residing in the United States who used Defendant's Digital Properties and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party."

### The California Subclass

"All natural persons residing in California who used Defendant's Digital Properties and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party."

### The Illinois Subclass

"All natural persons residing in Illinois who used Defendant's Digital Properties and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party."

### The Wisconsin Subclass

"All natural persons residing in Wisconsin who used Defendant's Digital Properties and whose Private Information was disclosed or transmitted to Pinterest or any other unauthorized third party."

203.   Excluded from the Class and the Subclasses are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

204.   Plaintiffs reserve the right to modify or to amend the definition

of the proposed classes before the Court determines whether certification is appropriate.

205. **<u>Numerosity</u>, Fed R. Civ. P. 23(a)(1).** The Class Members for each proposed Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are millions of individuals whose Private Information may have been improperly accessed by Pinterest and other unauthorized third parties, and the Classes are identifiable within Defendant's records.

206. **<u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3).** Questions of law and fact common to each Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of Users' Private Information;

f. Whether Defendant engaged in unfair, unlawful or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Defendant violated the consumer protection statutes invoked herein;

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

CLASS ACTION COMPLAINT

i.  Whether Defendant knowingly made false representations as to its data security and/or Privacy Policy practices;

j.  Whether Defendant knowingly omitted material representations with respect to its data security and/or Privacy Policies practices;

k.  Whether Defendant's knowing disclosure of its Users' individually identifiable health information to Pinterst is "criminal or tortious" under 18 U.S.C § 2511(2)(d); and

l.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm they face as a result of Defendant's disclosure of their Private Information.

207.  **Typicality,** Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information disclosed to third parties because of Defendant's use of Tracking Technologies.

208.  **Adequacy,** Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs has suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

209.  **Superiority and Manageability,** Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of

61

individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

210.    **Policies Generally Applicable to the Class.** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

211.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary

CLASS ACTION COMPLAINT

and duplicative of this litigation.

212.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

213.   Based on information and belief, adequate and direct notice can be given to Class Members using information maintained in Defendant's records.

214.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

215.   Further, Defendant has acted or refused to act on grounds generally applicable to each Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

216.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.  Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;
b.  Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information with respect to Defendant's Privacy Policies;

c.  Whether Defendant breached a legal duty to Plaintiffs and
Class Members to exercise due care in collecting, storing,
using and safeguarding their Private Information;

d.  Whether Defendant failed to comply with its own policies
and applicable laws, regulations, and industry standards
relating to data security;

e.  Whether Defendant adequately and accurately informed
Plaintiffs and Class Members that their Private Information
would be disclosed to third parties;

f.  Whether Defendant failed to implement and maintain
reasonable security procedures and practices appropriate to
the nature and scope of the information disclosed to third
parties; and

g.  Whether Class Members are entitled to actual, consequential,
and/or nominal damages, and/or injunctive relief as a result
of Defendant's wrongful conduct.

## **COUNT I**

### **COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION**
### *(On Behalf of Plaintiffs and the Nationwide Class)*

217.  Plaintiffs repeat the allegations contained in the foregoing
paragraphs as if fully set forth herein and bring this claim individually and on
behalf of the proposed Nationwide Class.

218.  Plaintiffs and Class Members have an interest in: (1) precluding
the dissemination and/or misuse of their sensitive, confidential
communications and protected health information; and (2) making personal
decisions and/or conducting personal activities without observation, intrusion
or interference, including, but not limited to, the right to visit and interact
with various internet sites without being subjected to wiretaps without
Plaintiffs' and Class Members' knowledge or consent.

219.  Plaintiffs and Class Members had a reasonable expectation of
privacy in their communications with Defendant via its Digital Properties and

the communications platforms and services therein.

220. Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable health information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

221. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

222. Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policy and other representations.

223. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare will be kept confidential.

224. Defendant's disclosure of private medical information coupled with individually identifying information is highly offensive to the reasonable person.

225. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

226. Defendant's secret and unauthorized disclosures of Plaintiffs and Class Members' Private Information—an invasion of their privacy—directly and proximately caused Plaintiffs and Class Members to be injured in that: (a) sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private; (b) Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Defendant eroded the essential

CLASS ACTION COMPLAINT

confidential nature of health services in which Plaintiffs and Class Members participated; (d) Defendant used something of value (the highly sensitive Private Information) that belonged to Plaintiffs and Class Members and obtained a benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation to Plaintiffs and Class Members for the unauthorized use of such data; (e) Defendant' actions diminished the value of Plaintiffs' and Class Members' Private Information; (f) Defendant violated the property rights of Plaintiffs and Class Members have in their Private Information; (g) Defendant denied Plaintiffs the benefit of the bargain insofar as Plaintiffs would not have used Defendant's services or would have demanded compensation for Defendant's use of their Private Information if they had known of Defendant's practices; and (h) Plaintiffs and Class Members have suffered mental distress caused directly by Defendant's collection and disclosure of their Private Information.

227. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

228. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

229. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

230. Plaintiffs also seek such other relief as the Court may deem just

CLASS ACTION COMPLAINT

and proper.

## COUNT II
### NEGLIGENCE
#### *(On Behalf of Plaintiffs and the Nationwide Class)*

231.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

232.    Defendant Walmart required Plaintiffs and Class Members to submit non-public personal information in order to obtain healthcare/medical products and/or services.

233.    Upon accepting, storing, and controlling the Private Information of Plaintiffs and the Class in its computer systems, Defendant owed, and continues to owe, a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard and protect her highly sensitive Private Information from disclosure to third parties.

234.    Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

235.    It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information through its use of the Pinterest Tag and other Tracking Technologies would result in unauthorized third parties, such as Pinterest, gaining access to such Private Information for no lawful purpose.

236.    Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class Members' Private Information arose due to the special relationship that existed between Defendant and its customers, which is recognized by statute, regulations, and the common law.

CLASS ACTION COMPLAINT

237.   In addition, Defendant Walmart had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

238.   Defendant Walmart's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

239.   Defendant's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information. Defendant's misconduct included the failure to (1) secure Plaintiffs' and Class Members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Pinterest Tag and other Tracking Technologies; and (5) prevent unauthorized access to Plaintiffs' and Class Members' Private Information by sharing that information with Pinterest and other third parties. Defendant's failures and breaches of these duties constituted negligence.

240.   As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class Members' Private Information, Plaintiffs and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

CLASS ACTION COMPLAINT

241.   Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiffs' and Class Members' Private Information constituted (and continue to constitute) negligence at common law.

242.   Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages, and Plaintiffs and Class Members are entitled to recover those damages in an amount to be determined at trial.

243.   Defendant Walmart's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant Walmart to (i) strengthen its data security systems and monitoring procedures; (ii) cease sharing Plaintiffs' and Class Members' Private Information with Pinterest and other third parties without Plaintiffs' and Class Members' express consent; and (iii) submit to future annual audits of its security systems and monitoring procedures.

## COUNT III

### UNJUST ENRICHMENT
#### (On Behalf of Plaintiffs and the Nationwide Class)

244.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Nationwide Class.

245.   Upon information and belief, Defendant Walmart funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

246.   As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is

CLASS ACTION COMPLAINT

allocated to data security is known to Defendant Walmart.

247.   Plaintiffs and Class Members conferred a monetary benefit on Defendant Walmart. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information.

248.   In exchange, Plaintiffs and Class Members should have received from Defendant Walmart the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

249.   Defendant Walmart knew that Plaintiffs and Class Members conferred a benefit which Defendant Walmart accepted. Defendant Walmart profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

250.   In particular, Defendant Walmart enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Private Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Private Information.

251.   Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant Walmart's decision to prioritize its own profits over the requisite security or privacy.

252.   Under the principles of equity and good conscience, Defendant Walmart should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant Walmart failed to implement appropriate data management, security or privacy measures that are mandated by industry standards.

253.   Defendant Walmart failed to secure Plaintiffs' and Class

Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

254.   If Plaintiffs and Class Members knew that Defendant Walmart had not reasonably secured their Private Information from disclosure to third parties, they would not have agreed to provide their Private Information to Defendant Walmart.

255.   Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damage.

256.   Furthermore, California law permits a standalone claim for unjust enrichment, allowing the court to construe the cause of action as a quasi-contract claim. *See, e.g., Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 756 (9th Cir. 2015). California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020). California law requires disgorgement of unjustly earned profits regardless of whether a Defendant's actions caused a Plaintiffs to directly expend his or her own financial resources or whether a Defendant's actions directly caused the Plaintiffs' property to become less valuable. Under California law, a stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable.

257.   As a direct and proximate result of Defendant Walmart's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

258.   Defendant Walmart should be compelled to disgorge into a

common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant Walmart's services.

## **COUNT IV**

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1),** *et seq.*
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiffs and the Nationwide Class)***

259.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth.

260.   The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

261.   The ECPA protects both sending and receipt of communications.

262.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

263.   The transmissions of Plaintiffs' PII to Defendant's Digital Properties qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

264.   Electronic Communications. The transmission of PII between Plaintiffs and Class Members and Defendant's Digital Properties with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical

CLASS ACTION COMPLAINT

system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

265.   Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8)(emphasis added).

266.   Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

267.   Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

268.   The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

   a.  Plaintiffs' and Class Members' browsers;

   b.  Plaintiffs' and Class Members' computing devices;

   c.  Defendant's web-servers; and

   d.  The Pinterest Tag code deployed by Defendant to effectuate the sending and acquisition of User communications.

269.   By utilizing and embedding the Pinterest Tag on its Digital Properties, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

270.   Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Tracking Technologies,

CLASS ACTION COMPLAINT

including the Pinterest Tag, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Pinterest.

271. Whenever Plaintiffs and Class Members interacted with Defendant's Digital Properties, Defendant, through the Pinterest Tag and other Tracking Technologies it embedded and operated on their Digital Properties, contemporaneously and intentionally redirected and disclosed the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Pinterest.

272. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII, treatment, medication, and the purchase of Sensitive Health Products.

273. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Pinterest and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

274. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

275. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the

purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

276.   Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communications.

277.   Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the Pixels.

278.   Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

279.   In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the use of Defendant's Digital Properties, including the search for and purchase of Sensitive Health Products and other Private Information, Defendant's purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

280.   The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

281.   Because of Defendant's simultaneous, unknown duplication, forwarding and interception of Plaintiffs' and Class Members' Private Information, Defendant do not qualify for the party exemption.

282.   Defendant's acquisition of User communications that were used and disclosed to Pinterest was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States

nationwide as set forth herein, including:

        a. Invasion of privacy;

        b. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

        c. California Invasion of Privacy Act, §§ 630, *et seq*.;

283. Here, as alleged above, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

284. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

285. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it: Used and caused to be used cookie identifiers associated with specific Users without their authorization; and disclosed individually identifiable health information to Pinterest without Users' authorization.

286. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

287. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Pinterest source code was for Defendant's commercial advantage to increase revenue from existing Users and gain new customers.

CLASS ACTION COMPLAINT

288.   Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Private Information on its Webpage, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with Pinterest and third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know was receiving their information, and that Plaintiffs and Class Members did not consent to receive this information

289.   As such, Defendant cannot viably claim any exception to ECPA liability.

290.   Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their PII and PHI (including information about their medical symptoms, conditions, and concerns, and medications and treatments) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

    b. Defendant received substantial financial benefits from its use of Plaintiffs' and the Class Members' PII and PHI without providing any value or benefit to Plaintiffs or the Class Members;

    c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and the Class Members' PII and PHI, such as understanding how people use its Digital Properties and determining what ads people see on its Digital Properties, without providing any value or benefit to Plaintiffs or the Class Members;

    d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the services for which

77

they paid, which included a duty to maintain the confidentiality of their health information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as medical treatment that Plaintiffs and Class Members intended to remain private no longer private.

291. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pinterest Tag to track and utilize Plaintiffs' and Class Members' Private Information for financial gain.

292. As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT V

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code §§ 630, *et. seq*.**
**(*On behalf of Plaintiff R.C. & the California Subclass*)**

293. Plaintiff R.C. ("Plaintiff" for the purpose of this count) repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed California Subclass.

294. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument,

78

contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

295.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its

remedial purpose of protecting privacy); Bra*dley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); I*n re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

296.   The Tracking Technologies, including the Pinterest Tag, are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

297.   At all relevant times, by employing the Tracking Technologies, Defendant intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and California Subclass Members on the one hand, and Defendant' Website on the other hand.

298.   At all relevant times, Defendant aided, agreed with, employed, and conspired with Pinterest and other third parties to use the Tracking Technologies, including the Pinterest Tag, to wiretap consumers to Defendant's Digital Properties and to accomplish the wrongful conduct at issue here.

299.   The wrongful conduct at issue occurred in the State of California, where Plaintiff's Private Information was intercepted and disclosed.

300.   Plaintiff and California Subclass Members did not consent to Pinterest's intentional access, interception, reading, learning, recording, and collection of Plaintiff's and California Subclass Members' electronic communications. Nor did Plaintiff and California Subclass Members consent to Defendant aiding, agreeing with, employing, or otherwise enabling Pinterest's conduct.

CLASS ACTION COMPLAINT

301.    The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing. Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiff continues to be at risk because she frequently uses the internet to search for information about products or services. They continue to desire to use the internet for that purpose, including for the purpose of acquiring healthcare services online. Plaintiff also continues to desire to use Defendant's Digital Properties in the future but has no practical way to know if her website communications will be monitored or recorded by Pinterest or any other third parties.

302.    Plaintiff R.C. and California Subclass Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

# COUNT VI

## VIOLATION OF ILLINOIS EAVESDROPPING STATUTE
### 720 Ill. Comp. Stat. 5/14, *et seq.*
### *(On Behalf of Plaintiff C.H. & the Illinois Subclass)*

303.    Plaintiff C.H. ("Plaintiff" for the purpose of this count) repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed Illinois Subclass.

304.    The Eavesdropping Article of the Illinois Criminal Code (the "Illinois Eavesdropping Statute" or "IES") states that it is a felony for any person to knowingly and intentionally "use[] an eavesdropping devise, in a surreptitious manner, for the purpose of transmitting or recording all or part of any private conversation to which he or she is a party unless he or she does

CLASS ACTION COMPLAINT

so with the consent of all other parties to the private conversation."[37]

305.   The IES also states that it is a felony for any person to knowingly and intentionally "use[] or disclose[] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties."[38]

306.   For purposes of the IES, "eavesdropping device" means "any device capable of being used to hear or record oral conversation or intercept or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means."[39]

307.   For purposes of the IES, "surreptitious" means "obtained or made by stealth or deception, or executed through secrecy or concealment."[40]

308.   For purposes of the IES, "private electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation. . . . Electronic communication does include any communication from a tracking device."[41]

309.   "A reasonable expectation shall include any expectation

---

[37] 720 ILL. COMP. STAT. 5/14-2(a), -4.

[38] *Id.*

[39] 720 ILL. COMP. STAT. 5/14-1(a).

[40] 720 ILL. COMP. STAT. 5/14-1(g).

[41] 720 ILL. COMP. STAT. 5/14-1(e).

recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution."[42]

310.   Defendant intentionally recorded and/or acquired Plaintiff's and Illinois Subclass Members' private electronic communications in Illinois, without the consent of Plaintiff and Illinois Subclass Members, using the Pinterest Tag and similar tracking technologies on its Website.

311.   Defendant intentionally recorded and/or acquired Plaintiff's and Illinois Subclass Members' private electronic communications for the purpose of disclosing those communications to third parties, including Pinterest, without the knowledge, consent, or written authorization of Plaintiff or Illinois Subclass Members.

312.   Plaintiff's and Illinois Subclass Members' communications with Defendant which took place in Illinois, constitute private conversations, communications, and information.

313.   Plaintiff and Illinois Subclass Members had a reasonable expectation of privacy in their communications with Defendant via its Website.

314.   Plaintiff and Illinois Subclass Members communicated sensitive PHI and PII that they intended for only Defendant to receive and that they understood Defendant would keep private.

315.   Plaintiff and Illinois Subclass Members have a reasonable expectation that Defendant would not disclose PII, PHI, and confidential communications to third parties without Plaintiff's or Illinois Subclass Members' authorization, consent, or knowledge.

---

[42] *Id.*

CLASS ACTION COMPLAINT

316. Plaintiff and Illinois Subclass Members had a reasonable expectation of privacy given Defendant's representations, Privacy Policy and HIPAA. Moreover, Plaintiff and Illinois Subclass Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

317. Plaintiff and Illinois Subclass Members were unaware that their Private Information was being surreptitiously recorded and transmitted to third parties such as Pinterest as they communicated with Defendant through its Website.

318. Without Plaintiff's or Illinois Subclass Members' knowledge, authorization, or consent, Defendant used the Pinterest Tag and other tracking codes imbedded and concealed into the source code of its Website, to secretly record and transmit Plaintiff's and Illinois Subclass Members' private communications to hidden third parties, such as Pinterest.

319. Under the IES, "[a]ny or all parties to any conversation or electronic communication upon which eavesdropping is practices contrary to this Article shall be entitled to the following remedies: (a) [t]o an injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either; (b) [t]o all actual damages against the eavesdropper or his principal or both; [t]o any punitive damages which may be awarded by the court or by a jury. . . ."[43]

320. The eavesdropping devices used in this case include, but are not limited to:

        a. The Pinterest Tag, cookies and other third party tracking codes and programs employed by Defendant on its Website;

---

[43] 720 ILL. COMP. STAT. 5/14-6.

b. Plaintiff's and Illinois Subclass Members' personal computing devices;

c. Plaintiff's and Illinois Subclass Members' web browsers;

d. Plaintiff's and Illinois Subclass Members' browser-managed files;

e. Defendant's web servers; and

f. Web and ad-servers of third parties (including Pinterest) to which Plaintiff's and Illinois Subclass Members' communications were disclosed.

321.   The eavesdropping devices outlined above are not excluded "tracking devices" as that term is used in the IES, 720 ILCS 5/14-1(e), to the extent that they perform functions other than collection of geo-locational data.[44]

322.   Defendant is a "person" under the IES.[45]

323.   Defendant aided in the interception of communications between Plaintiff and Illinois Subclass Members and Defendant that were redirected to and recorded by third parties without Plaintiff's or Illinois Subclass Members' consent.

324.   Under the IES, Plaintiff and Illinois Subclass Members are entitled to injunctive relief prohibiting further eavesdropping by Defendant, actual damages, and punitive damages.

325.   Defendant's breach caused Plaintiff and Illinois Subclass Members the following damages:

---

[44] *See Vasil v. Kiip, Inc.*, No. 16-cv-9937, 2018 U.S. Dist. LEXIS 35573, at *20-25 (N.D. Ill. Mar. 5, 2018).

[45] 720 ILL. COMP. STAT. 5/2-15.

CLASS ACTION COMPLAINT

a. Sensitive and confidential information that Plaintiff and Illinois Subclass Members intended to remain private is no longer private;

b. Defendant took something of value from Plaintiff and Illinois Subclass Members and derived benefit therefrom without Plaintiff's and Illinois Subclass Members' knowledge or informed consent and without sharing the benefit of such value;

c. Plaintiff and Illinois Subclass Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality, and;

d. Defendant's actions diminished the value of Plaintiff's and Illinois Subclass Members' personal information.

326.    Plaintiff C.H. and Illinois Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT VII

**VIOLATIONS OF VIOLATION OF WISCONSIN ELECTRONIC SURVEILLANCE CONTROL LAW, WIS. STAT. § 968.31
(Interception and disclosure of wire, electronic or oral communications)
*(On Behalf of Plaintiff K.B. and the Wisconsin Subclass)***

327.    Plaintiff K.B. ("Plaintiff" for the purpose of this count) repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed Wisconsin Subclass.

328.    All conditions precedent to this action have been performed or have occurred.

329.   Wis. Stat.§ 968.31 prohibits the interception and disclosure of wire, electronic or oral communications. Specifically, under Wis. Stat § 968.31(1), the following acts are prohibited:

      a.  "Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication."

      b.  "Intentionally uses, attempts to use or procures any other person to use or attempt to use any electronic, mechanical or other device to intercept any oral communication."

      c.  "Discloses, or attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

      d.  "Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section."

330.   Defendant intercepted Plaintiff's and Wisconsin Subclass Members' electronic communications for the purpose of committing multiple tortious acts, including, but not limited to the criminal and tortious acts specified below.

331.   For example, Defendant intercepted Plaintiff's and Wisconsin Subclass Members' electronic communications for the purpose of disclosing

CLASS ACTION COMPLAINT

those communications to third parties without the knowledge, consent, or written authorization of Plaintiff or Wisconsin Subclass Members.

332.    Defendant's misconduct falls within the ambit of Wisconsin's wiretapping statute because the disclosure of Plaintiff's and Wisconsin Subclass Members' Private Information to third parties-without consent or proper authorization-is an illegal or tortious act that violates multiple laws, including (but not limited to) Wis. Stat. § 995.50. Further, as set forth *supra* and *infra*, Defendant' interception and disclosure of Plaintiff's and Wisconsin Subclass Members' electronic communication commits, under Wisconsin law, the torts of invasion of privacy as well as conversion and breach of fiduciary duty.

333.    Wis. Stat § 968.31 (2m) provides that "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of §§ 968.28 to 968.37 shall have a civil cause of action against any person who intercepts, discloses or uses; or procures any other person to intercept, disclose, or use, the communication."

334.    Defendant qualifies as a person under the statute.

335.    Under Wis. Stat. § 968.27, Wisconsin defines "electronic communications" to mean "any transfer of signs, signals, writing; images, sounds, data or intelligence of any nature wholly or partially transmitted by a wire, radio, electromagnetic, photoelectronic or photooptical system."

336.    Plaintiff's and Wisconsin Subclass Members' communications with Defendant constitute "electronic communications" under Wisconsin law.

337.    Plaintiff's and Wisconsin Subclass Members' communications with Defendant constitute "electronic communications" because each communication was the transfer of data or intelligence; including, but not

CLASS ACTION COMPLAINT

limited to:

    a.  the parties to the communications;

    b.  the precise text of Plaintiff's and Wisconsin Subclass Members' search queries;

    c.  personally identifiable information such as Plaintiff's and Wisconsin Subclass Members' IP addresses, Pinterest IDs, browser fingerprints , and ether unique identifiers;

    d.  the precise text of Plaintiff's and Wisconsin Subclass Members' communications about specific Sensitive Health Products;

    e.  the precise text of Plaintiff's and Wisconsin Subclass Members' communications about specific medical conditions;

    f.  the precise text of Plaintiff's and Wisconsin Subclass Members' communications about specific treatments;

    g.  the precise dates and times when Plaintiff and Wisconsin Subclass Members visit Defendant's Digital Properties to view, add to cart, and purchase Sensitive Health Products;

    h.  information that is a general summary or informs third parties of the general subject of communications that Defendant send back to Plaintiff and Wisconsin Subclass Members in response to search queries and requests for information about specific Sensitive Health Products, medical conditions, medical treatments, and other information; and

    i.  any other content that Defendant has aided third parties in scraping from webpages or communication forms on the

Digital Properties.

338.   Plaintiff's and Wisconsin Subclass Members' communications with Defendant constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic; and/or photoelectronic systems including, but not limited to:

    a.  Plaintiff's and Wisconsin Subclass Members' personal computing devices;

    b.  Plaintiff's and Wisconsin Subclass Members' web browsers;

    c.  Plaintiff's and Wisconsin Subclass Members' browser-managed files;

    d.  The Pinterest Tag and similar tracking technologies;

    e.  Internet cookies;

    f.  Defendant' computer servers;

    g.  Third-party source code used by Defendant; and

    h.  Computer servers of third parties (including Pinterest) to which Plaintiff and Wisconsin Subclass Members' communications were disclosed.

339.   By bartering and/or selling Plaintiff's and Wisconsin Subclass Members' Private Information to third parties in return for access to marketing and/or analytics tools and by embedding tools on its websites that automatically reroute Plaintiff's and Wisconsin Subclass Members' Private Information to those third parties, Defendant:

    a.  procured third parties to intercept or attempt to intercept electronic communications in violation of Wis. Stat. § 968.31;

    b.  disclosed, or attempt to disclose, to third parties the contents of electronic communications, knowing or having reason to

know that the information was obtained through the interception of electronic communications in violation of Wis. Stat. § 968.31; and

c. used, or attempted to use, the contents of electronic communications; knowing or having reason to know that the information was obtained through the interception of electronic communications in violation of Wis. Stat. § 968.31.

340. Defendant engaged in and continues to engage in interception by aiding others (including Pinterest) to secretly record the contents of Plaintiff's and Wisconsin Subclass Members' electronic communications.

341. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Wisconsin Subclass Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

342. Plaintiff and Wisconsin Subclass Members reasonably expected that their Private Information was not being intercepted, recorded, and disclosed to third parties.

343. No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiff's and Wisconsin Subclass Members' Private Information to third parties. Neither Plaintiff nor Wisconsin Subclass Members consented to the disclosure of their Private Information by Defendant to third parties. Nor could they have consented, given that Defendant never sought Plaintiff's or Wisconsin Subclass Members' consent; or even told visitors to its website that their every interaction was being recorded and transmitted to third parties.

CLASS ACTION COMPLAINT

344. Plaintiff's and Wisconsin Subclass Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Private Information, including using their sensitive medical information to develop marketing and advertising strategies.

345. Under Wis. Stat. § 968.31(2m), aggrieved persons are entitled to; "(a) Actual damages. but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) Punitive damages; and (c) A reasonable attorney's fee and other litigation costs reasonably incurred."

346. In addition to statutory damages, Defendant's breach caused Plaintiff and Wisconsin Subclass Members the following damages:

    a. sensitive and confidential information that Plaintiff and Wisconsin Subclass Members intended to remain private is no longer private; and

    b. Defendant took something of value from Plaintiff and Wisconsin Subclass Members and derived benefit therefrom without Plaintiff's and Wisconsin Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

347. Plaintiff K.B. and Wisconsin Subclass Members also seek such other relief as the Court may deem equitable, legal, and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, prays for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class, the California Subclass, the Illinois Subclass, and the Wisconsin

Subclass and appointing the Plaintiffs and their Counsel to represent the Classes;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.    injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D.    an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.    an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.    prejudgment interest on all amounts awarded and

G.    all such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: September 18, 2024          Respectfully Submitted,

*/s/ Matthew J. Langley*
Matthew J. Langley
California Bar No. 342286
**ALMEIDA LAW GROUP LLC**
849 W Webster Avenue
Chicago, Illinois 60614

93

Tel: (312) 576-3024
matt@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Ph: (312) 576-3024
david@almeidalawgroup.com

Brandon M. Wise*
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Tel: (314) 833-4825
bwise@peifferwolf.com

Andrew R. Tate*
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Tel: (314) 669-3600
atate@peifferwolf.com

Melisa A. Rosadini-Knott
California Bar No. 316369
**PEIFFER WOLF CARR KANE
CONWAY & WISE LLP**
3435 Wilshire Blvd. Ste 1400
Los Angeles, CA 90010-1923
323-982-4109
rosadini@peifferwolf.com

*Attorneys for Plaintiffs & the Putative Classes*

* Pro Hac Vice to be filed

94

CLASS ACTION COMPLAINT